*686 TEXTO COMPLETO DE LA SENTENCIA
Colgate-Palmolive de Puerto Rico, Inc. (Colgate) solicita que revisemos la resolución del Tribunal de Primera Instancia, Sala Superior de San Juan, que declaró No Ha Lugar la moción de sentencia sumaria, mediante la cual había solicitado la desestimación de la causa de acción en su contra, la cual fue presentada al amparo del Art. 1489 del Código Civil, 31 L.P.R.A. see. 4130, por el Sr. Luís Félix Reyes Mojica (Reyes). Señala Colgate, que incidió el tribunal, ya que procedía la desestimación, porque el reclamo de Reyes no cumple con los requisitos del Art. 1489, supra, y, además, porque dicha causa de acción se refiere a un contrato de transporte mercantil, sujeto a las disposiciones del Código de Comercio, 10 L.P.R.A. secs. 1001 et seq., lo que según ésta excluye un reclamo al amparo del Art. 1489, supra. Examinados los hechos del caso de autos y el derecho aplicable, expedimos el auto de certiorari, confirmamos la denegatoria de la desestimación solicitada por Colgate, y devolvemos el caso al Tribunal de Primera instancia para que continúen los procedimientos en el mismo.
I
El 15 de agosto de 2002, Access Transportation and Logistics, Inc. (Access) y Colgate suscribieron un extenso contrato, disponiendo los términos bajo los cuales Access proveería para Colgate los servicios de “logistics” y transportación para materia prima, “goods-in process”, productos terminados, “pallets”, “supplies”, materiales de empaque, equipos y otros. Los envíos incluyen como fuentes (“sources”), y como destinatarios, las plantas de los suplidores de Colgate, las plantas manufactureras de Colgate y los almacenes de Colgate, algunos de los cuales están fuera de Puerto Rico. El contrato entre Colgate y Access consta de un documento principal de 13 páginas, el cual dispone en sustancial detalle los términos de la relación entre el “shipper” (Colgate) y el “carrier” (Access) (véase las páginas 115 a 128 del apéndice, en adelante Ap. 115-128). Además del documento principal, incluido en el apéndice del presente recurso, el acuerdo entre Access y Colgate incluye seis apéndices al documento principal, cuatro de ellos dedicados a las tarifas (o precios) aplicables a los transportes (Schedule of Rates and Charges) pre-establecidos; el Apéndice V, que define el equipo que Access viene obligada a tener disponible y utilizar; y el Apéndice VI, el cual define el sistema de información que Colgate le requiere a Access que mantenga.
El 7 de agosto de 2003, efectivo retroactivo al 1ro de julio de 2003, Access y el Sr. Reyes d/b/a Luis Transport Service suscribieron un contrato denominado “Confidential Motor Carrier Transportation Agreement” (Ap. 87-92). El acuerdo incluye, por referencia, tres documentos, denominados Attachment I, II y III, mediante los cuales se dispone la tarifa (o precio) de cada entrega. Dicho acuerdo, entre otros, incluye una cláusula de no competencia por tres años, luego de terminado el mismo, respecto los clientes de Access y disponía que el acuerdo era confidencial. En la misma fecha, ante el mismo notario, las partes otorgaron un “Acuerdo de No Competencia, Secretividad, Confidencialidad y Otros Particulares” (Ap. 82-89). Este segundo acuerdo elabora los aspectos de secretividad y no competencia, los cuales se incluian en términos generales en el primer acuerdo.
El 23 de febrero de 2005, el Sr. Reyes, su esposa y sociedad de gananciales, d/b/a Luis Transport Service, presentaron una demanda sobre incumplimiento de contrato, cobro de dinero y daños contra Colgate y su compañía aseguradora; y Access y su compañía aseguradora. Entre otros, Reyes adujo que Access lo había subcontratado para que llevara a cabo el acarreo intra isla de Colgate y que al darse por terminado el acuerdo entre Colgate y Access, esta última le adeudaba facturas de los meses de noviembre y diciembre de 2004 y de *687 enero de 2005, ascendentes a un total de $48,123.78. Reclamó, además, que Access/Colgate incumplieron con las cláusulas sobre prenotificación de terminación de contrato. Finalmente, adujo que conocía que Colgate no le había pagado a Access por facturas relacionadas a dichos transportes.
A base de los hechos expuestos, Reyes reclamó ser acreedor de una causa de acción directa contra Colgate, al amparo del Art. 1489 del Código Civil, 31 L.P.R.A. see. 4130, por la suma que le adeudaba Colgate a Access. Adujo, además, aunque esto no está ante nuestra consideración, que Access y Colgate habían actuado antijurídicamente y en violación de lo provisto en los contratos, causándole daños que valuó en $200,000. Como remedios, además del pago de lo que se le adeudaba y del resarcimiento de los daños, solicitó que se ordenara a Colgate consignar en el tribunal la suma de dinero que ésta le adeudaba a Access, de forma que dichos fondos estuviesen disponibles para pagarle a él lo que se le adeudaba.
Colgate contestó la demanda negando que Reyes tuviese una causa de acción en su contra al amparo del Art. 1489, supra. No obstante, aceptó que existían varias facturas de Access a Colgate pendientes de pago, las cuales podrían estar relacionadas a los transportes realizados por Reyes. Por su parte, Access contestó la demanda, negando la deuda reclamada por Reyes y presentando una reconvención contra éste. Ahora bien, al igual que Colgate, aceptó que ésta todavía le debía cierta cantidad de dinero.
El 17 de febrero de 2006, Colgate presentó una moción de sentencia sumaria en la cual solicitó se desestimara sumariamente la reclamación de Reyes contra Colgate. Argumentó que su contrato está reglamentado por el Código de Comercio, 10 L.P.R.A. secs. 1001 et seq., en particular bajo el Capítulo 85 del título 10, 10 L.P.R.A. sees. 1771 a 1801, y no procede que se aplique al caso de autos el Art. 1489 del Código Civil, 31 L.P.R.A. see. 4130. Alegó, además, que aun si fuese aplicable el Código Civil, los hechos del caso no cumplen los requisitos para la aplicación del Art. 1489, supra. La moción de sentencia sumaria fue seguida por escritos de oposición, réplica, etc., entre Colgate y Reyes.
El 26 de mayo de 2006, el tribunal emitió resolución exponiendo: “A la Solicitud de Sentencia Sumaria presentada por Colgate, no ha lugar.” Inconforme, Colgate presentó el recurso de certiorari que aquí atendemos señalando que:

“Erró el TPI al declarar sin lugar la Solicitud de Sentencia Sumaria, toda vez que no existe controversia alguna sobre los hechos materiales de este caso, los cuales demuestran que nunca ha habido un acuerdo entre Colgate y la parte demandante-recurrida. Resta solamente aplicar el derecho, a base del cual no cabe sino concluir que el Contrato suscrito por Luis Transport y Access no cumple los requisitos para la aplicación del Artículo 1489 y, además, es un contrato de transporte terrestre mercantil sujeto a las disposiciones del Código de Comercio. Por ende, la parte demandante-recurrida no tiene derecho a cobrar a Colgate la alegada deuda de Access y procede la desestimación sumaria de su reclamación contra Colgate. ”

Reyes presentó su alegato en oposición y Colgate presentó una réplica.
II
En Medina v. M. S. & D. Química P.R., Inc., 135 D.P.R. 716 (1994), el Tribunal expuso respecto la naturaleza y utilidad de la moción de sentencia sumaria como sigue:
“La sentencia sumaria es un mecanismo procesal extraordinario y discrecional, que procede cuando la parte promovente le demuestra al tribunal que no existe necesidad de que se celebre una vista evidenciaría del caso en su fondo. Como regla general, se dicta sentencia a base de los documentos admisibles en evidencia sometidos por el promovente con su moción, los documentos sometidos por la parte promovida con su moción en oposición y aquellos que obran en el expediente del tribunal. Tradicionalmente los tribunales han acogido mociones de sentencia sumaria acompañadas con documentos admisibles en evidencia, cuando se demuestra que no hay *688 hechos materiales esenciales en controversia y que procede, como cuestión de derecho, que ésta se dicte. En otras palabras, se dicta sentencia sumaria cuando ha quedado claramente establecido que para resolver la controversia no hace falta una vista evidenciaría. Bajo estas circunstancias, la norma de economía procesal, Regla 1 de Procedimiento Civil, aconseja que se solucione el pleito de esta forma expedita. Reglas 1, 36 y 43.6 de Procedimiento Civil; Corp. Presiding Bishop C.J.C. of L.D.S. v. Purcell, 117 D.P.R. 714 (1986).”
En ¿tención a la etapa procesal del litigio, al considerar la solicitud de desestimación, las alegaciones presentadas por las partes han de interpretarse en la forma más favorable a la parte promovida, en este caso, Reyes. “Sólo debe concederse la moción de sentencia sumaria desestimando una reclamación cuando el promovente ha establecido su derecho con claridad y ha quedado demostrado que la otra parte no tiene derecho a recobrar bajo cualquier circunstancia que resulte discernible de la prueba”. Medina v. M. S. & D. Química P. R., Inc., supra. Por lo tanto, la denegación de la solicitud de desestimación de la causa de acción en la presente etapa procesal no equivale a una determinación de que el demandante es acreedor al remedio solicitado, ya que tal conclusión sólo procede luego del desfile de prueba y la formulación de las correspondientes determinaciones de hechos. Así evitamos que se vaya a despojar a Reyes de un derecho, sin que se le provea la oportunidad de demostrar que es acreedor al mismo.
En la moción de sentencia sumaria presentada por Colgate, ésta solicita que se desestime la demanda, aduciendo que de las alegaciones de las partes litigantes y la evidencia documental que acompaña la solicitud de sentencia sumaria, principalmente los contratos entre Colgate y Access y entre Access y Reyes, se desprende que Reyes no tiene causa de acción contra Colgate. Los argumentos presentados ante el tribunal de instancia por Colgate, como base para solicitar la desestimación de la demanda en su contra mediante sentencia sumaria, al igual que en su escrito de Solicitud de Certiorari, giran alrededor de la discusión de las siguientes dos proposiciones. La primera, es que los hechos de autos se rigen por el Código de Comercio, no por el Código Civil, por lo que no procede un reclamo bajo el Art. 1489 del Código Civil, 31 L.P.R.A. see. 4130. La segunda proposición es que, aun examinados desde la perspectiva del Código Civil, lo reclamado por Reyes, no llena los requisitos para una causa de acción al amparo del Art. 1489, supra, porque no constituye un contrato de arrendamiento de obra.
Por lo tanto, la controversia a dilucidar en el presente recurso es fundamentalmente una de derecho, a saber, si Reyes sería acreedor de un remedio al amparo del Art. 1489, supra, de probarse en su día las alegaciones de la demanda. Ahora bien, para dilucidar tal controversia el tribunal tiene necesariamente que adjudicar los alcances del contrato de transporte que suscribieron Luis Transport Services y Access.
III
Asumiendo que se concluyera que la situación de autos estuviese cubierta por el Código de Comercio, ello no convierte en irrelevante o impertinente lo dispuesto en el Código Civil. El Art. 2 del Código de Comercio, 10 L.P. R.A. see. 1002, dispone que “Los actos de comercio ...se regirán por las disposiciones contenidas en [el Código de Comercio]: y en su defecto, por los usos del comercio observados generalmente en cada plaza y a falta de ambas reglas, por las del derecho común. ” (Énfasis suplido.) De lo anterior, se desprende que el Código de Comercio se considera como una ley especial, respecto la ley general, la cual se encuentra en el Código Civil. Si una situación está expresamente contemplada en el Código de Comercio, lo dispuesto en éste prevalece sobre cualquier disposición contraria del Código Civil. Típico de estas situaciones es la prescripción, la cual está contemplada en los Arts. 939 a 950 del Código de Comercio, 10 L.P.R.A. sees. 1901 a 1912. Colgate no nos ha señalado y nosotros no conocemos de ninguna disposición del Código de Comercio que sea incompatible o contradictoria con lo dispuesto en al Art. 1489 del Código Civil.
Ante una situación no contemplada en el Código de Comercio, el Art. 2 de éste nos refiere a la norma pertinente del Código Civil, a saber el Art. 1489, supra. Al contemplar la aplicación de dicha norma jurídica a la situación de autos debemos, además, considerar la motivación del legislador al adoptar la misma.
*689 El Art. 1489 del Código Civil dispone que:
“Los que ponen su trabajo y materiales en una obra ajustada alzadamente por el contratista, no tiene acción contra el dueño de ella, sino hasta la cantidad que éste adeuda a aquél cuando se hace la reclamación. ”
En Goss, Inc. v. Dycrex Const. & Co, S.E., 141 D.P.R. 342, 356, 357 1996), el Tribunal Supremo comentó sobre los valores implícitos y motivación del legislador al aprobar el Axt. 1489, supra, como sigue:
"... tenemos la obligación de inclinarnos "hacia aquella solución que mejor capte el impacto del estatuto en términos del bienestar general y que mejor perciba la intención legislativa al adoptar la norma enfilada a propiciar el interés público...". Art. 19 del Código Civil, 31 L.P.R.A. sec. 19; Díaz Marín v. Mun. de San Juan, 117 D.P.R. 334 (1986); Asoc. Médica de P.R. v. Cruz Azul, 118 D.P.R. 669 (1987); Industria Cortinera Inc. v. P. R.T.C., 132 D.P.R. _ (1993); Colegio Internacional Sek Puerto Rico, Inc. v. Escribá, 94 J.T.S. 46.
El derecho de acción que otorga el Artículo 1489 del Código Civil, a favor de obreros y materialistas ha sido concebido por este Tribunal, al igual que por algunos autores, como un legado en respuesta a consideraciones de orden público, moral y de equidad. Amer. Suretv Co. v. Tribunal Superior, supra, a la pág. 455; Empresas Capote, Inc. v. Tribunal Superior, supra, a la pág. 770; The Comm. Ins. Co. v. Cía. de Fomento Ind., supra, a la pág. 159. A tales fines, la doctrina es cónsona al admitir que la acción consagrada por la disposición en cuestión, surge a raíz de considerarse ilícito "que el dueño o [contratista] o ambos, hasta por fraudulenta confabulación, se enriquezcan dañadamente con el esfuerzo o la aportación impagada de [los obreros] y materialistas." C. Armstrong e Hijos v. Díaz, supra, a la pág. 824-825; Amer. Surety Co. v. Tribunal Superior, supra, a la pág. 455; Scaevola, supra, pág. 159; Puig Peña, supra, pág. 359; Castán Tobeñas, supra, pág. 517; Espín Cánovas, Manual de Derecho Civil Español, Vol. III 6ta.ed. (Madrid 1983) pág. 644. La reclamación en cuestión ha sido catalogada como una "auténtica, verdadera y ejemplar acción de enriquecimiento injusto, intrínsecamente directa; es un caso claro de vigencia de la actio in rem verso: a través del patrimonio del contratista se enriquece el comitente, mientras se empobrecen correlativamente los operarios o suministradores, no ligados entre sí por causa jurídica alguna ". Nart, Ignacio, "Contrato de Obra y Empresa ", 35 Rev. Der. Priv. 814, 825 (1951); Castán Tobeñas, supra, pág. 517. (Énfasis suplido.)

Según señaláramos en American Surety, supra, por medio de esta acción se intenta propiciar el pronto pago en favor de aquellos obreros y materialistas que ayudaron en la ejecución de una obra ajena. Por otro lado, advierte Scaevola que existe una paridad entre los obreros y materialistas protegidos por esta acción y los edificantes de buena fe en los casos de accesión. Scaevola, supra, pág. 159; Amer. Surety Co. v. Tribunal Superior, supra, a la pág. 456. En ambos supuestos existe un tercero de buena fe con derecho a los materiales, otro que incorpora los materiales y un dueño en cuyo provecho ha de ceder la edificación. Procede por tanto, que los mismos principios que permiten al edificante de buena fe recobrar del dueño el valor de lo incorporado, sean aplicados a los materialistas y obreros que con su labor le sirvieron de beneficio al dueño de la obra. Después de todo, como apuntara Scaevola en su obra, "[njunca el trabajo y la laboriosidad ajenos deben ser objeto de dispendio [de otros]”. (Énfasis suplido). Scaevola, supra, pág. 160. Resulta justo, pues, que aquellos en cuya gracia de trabajo y materiales se produjo la obra, obtengan un derecho exclusivo sobre su crédito. Laurent, supra, pág. 96. (Énfasis suplido.)

En Empresas Capote, Inc. v. Tribunal Superior, 103 D.P.R. 765, (1975), el Tribunal Supremo comentó:

“A tal enfoque doctrinario, con visión renovadora de los preceptos de nuestro Código Civil, y a tono con las exigencias y métodos de contratación moderna resolvemos ahora, que dentro del amplio molde de la figura de contrato de arrendamiento de obras y servicios están claramente comprendidas las llamadas profesiones y artes liberales, tales como los arquitectos; profesión cuyo ejercicio presupone el desempeño de trabajo susceptible, como en el caso de autos, de realizarse en obra ajustada alzadamente mediante contrato beneficiándole -de 
*690
concurrir los demás requisitos-, la acción directa contra el dueño de la obra reconocida en el Art. 1489 y según los pronunciamientos en nuestra doctrina jurisprudencial.

Esta conclusión se deriva no sólo de los términos literales del artículo antes citado, que al referirse "ponen su trabajo" lo hace sin cualificación de clase alguna, sino al tenor de sentido espiritual de equidad y justicia que lo informa.

Al incorporarse este precepto sustantivo al Código Civil Español en su Art. 1597, "...se prescindió de denominaciones profesionales, utilizando expresión general que da idea de ser instituida la acción en favor y garantía del trabajo en varias excepciones o formas remunerativas, si bien persigue el lucro estricto del salario u otro más amplio, compensador de aptitudes, riesgos o esfuerzos... ." Sentencia del Tribunal Supremo de España de 29 de junio de 1936. ”

El comentarista Scaevola, con atinada clarividencia observa:

"El arrendamiento de obra es un contrato por el cual una de las partes se encarga de hacer una cosa para la otra, mediante un precio convenido entre ellas.

El contrato de obra lo es de fuerza inteligente adecuada a una finalidad constructiva o transformadora. Su objeto actual es una potencialidad latente (trabajo) y una representación ideal de la cosa que aquella potencialidad, hábilmente dirigida, ha de producir.

Esencialmente, el contrato de obra es contrato de trabajo; no fuerza muscular o mental aisladamente considerada como factores del todo patrimonial, sino ligada con la producción de una cosa concreta, que mediante un precio estimativamente determinado ha de pasar, una vez construida, al dominio ajeno.

La prestación puede ser de trabajo o industria.... Trabajo es esfuerzo u ocupación en alguna obra o ministerio. Industria es oficio, profesión mecánica que uno ejerce.

Estas distintas dicciones calificadas por una mayor especialización de la destreza, carecen de todo valor legal y deben borrarse del texto.

El peón que amasa el yeso y el ingeniero que proyecta un ferrocarril realizan trabajo, porque uno en las faldas y otro en las cumbres de la inteligencia, ponen a contribución su patrimonio personal, hacen, ejecutan, cooperan a la ejecución de una obra determinada.

Todas estas justificaciones teóricas tienen innegable fundamento, ya se atienda al trabajo manual remunerado con salario, ya a la provisión de materiales por contratos de compra efectuados entre los proveedores y el contratista. La razón fundamental es de equidad, y consiste en no ser lícito que dueño o empresario, o ambos, hasta por fraudulenta confabulación, se enriquezcan dañadamente con el esfuerzo o la aportación impagada de operarios y materialistas (voz corriente en la técnica vulgar y adulterada de los oficios constructivos)."XXIV, Scaevola, Código Civil, págs. 75-76 (1950).

Manresa, en la obra citada resume la cuestión del siguiente modo:

"En todos los casos [de trabajadores intelectuales, domésticos y operarios] se descubre el mismo fenómeno: el individuo que es dueño de sus fuerzas físicas o intelectuales las ejercita en provecho cierto de sus semejantes a cambio de la pactada compensación económica: el trabajo es el objeto del contrato." Pág. 676.

A la luz de los valores en que el Art. 1489, supra, se fundamenta, somos de la opinión que dicha norma se *691 puede aplicar a la situación de autos, aun si por algún razonamiento técnico se llegara a la conclusión que el contrato entre Colgate y Access se rige por el Código de Comercio. Al aplicar el Código Civil como derecho supletorio, es evidente que no procedería la desestimación por la vía sumaria instada por Colgate.
IV
La segunda proposición, en la cual Colgate basa su solicitud de desestimación, es su aseveración de que, aun examinado desde la perspectiva del Código Civil, lo reclamado por Reyes no llena los requisitos para una causa de acción al amparo del Art. 1489, supra, porque no constituye un contrato de arrendamiento de obra, esto es, de bienes y servicios.
Los escritos de Colgate presentan un confuso análisis porque dicha parte enfatiza que no existe un contrato escrito entre Reyes y Colgate, bajo el cual Reyes pueda reclamar a Colgate el pago de lo que se le adeuda. Este énfasis, presentando lo anterior como si fuera la controversia central en el caso, se refleja en su presentación de los hechos que estima pertinentes y en sus argumentos ante el tribunal de instancia y ante este Foro. Pero este hecho es impertinente a la controversia real, ya qne el reclamo de Reyes es al amparo del Art. 1489 del Código Civil, 31 L.P.R.A. see. 4130. Dicho artículo presume que no existe una relación contractual directa entre el comitente (también conocido como dueño de la obra), en el presente caso Colgate, y el subcontratista, materialista u obrero, en el caso de autos, Reyes. El mencionado artículo se refiere al derecho del cual son acreedores los subcontratistas, materialistas u obreros, cuyo contrato es con un tercero, denominado contratista; siempre y cuando el contratista tenga un contrato de ejecución de obra con el comitente de la obra.
Colgate argumenta que, aun si se considerara el contrato bajo el Código Civil, no procede la causa de acción bajo el Art. 1489, 31 L.P.R.A. sec. 4130, ya que los hechos del caso de autos no configuran un contrato de obra. El derecho que concede el Art. 1489 al subcontratista, materialista u obrero para proceder en acción directa en cobro de dinero contra el comitente o dueño de la obra, es un derecho que el Código Civil provee solamente cuando el contrato entre el comitente y el contratista general es un contrato de obra. Según veremos, los contratos que aquí nos conciernen son contratos de obra, según se define dicho término para propósito del Código Civil.
El Art. 1489, supra, dispone:

“31 L.P.R.A. § 4130 Acción contra el dueño por personas que ponen trabajo y materiales en obra ajustada por contratista.

Los que ponen su trabajo y materiales en una obra ajustada alzadamente por el contratista no tienen acción contra el dueño de ella, sino hasta la cantidad que éste adeude a aquél cuando se hace la reclamación. ”

El Art. 1489, supra, es parte del Capítulo 305 del Código Civil, sobre Arrendamiento de Obras y Servicios. Los contratos de obra incluyen los contratos para la construcción de estructuras, y la jurisprudencia sobre dicho artículo se ha desarrollado con relación a contratos de construcción. Por ello, es fácil concluir equivocadamente que los contratos de ejecución de obra se limitan a la construcción y reparación de estructuras. Pero no es así, el concepto de contrato de obra que considera el Código Civil es mucho más amplio, incluyéndose entre dichos contratos, el contrato de servicio, como lo es el de transporte. El contrato de obra es uno en el cual el comitente adquiere el derecho a obtener un resultado mediante la actividad del contratista, a distinción de una mera actividad o esfuerzo, y a cambio de ello el comitente se obliga a pagar al contratista un precio fijo.
Para su cabal entendimiento, es pertinente la discusión del concepto de contrato de obra en Puig Brutau, Fundamentos de Derecho Civil, t. II, vol. II, 2da ed., Bosch, Barcelona, 1982, págs. 438-441. El tratadista discute el concepto del contrato de obra como sigue:

*692
“4. El contrato de ejecución de obras

(4)1. Concepto. - Como ya se ha dicho, es el contrato por el que una de las partes, llamada contratista, empresario o artífice, se obliga frente a otra, llamada principal o comitente, a la producción de un determinado resultado con su actividad independiente, a cambio de un precio cierto.

En la moderna doctrina es opinión dominante que tanto del contrato de prestación de servicios como del de ejecución de obras se ha de desterrar el criterio anacrónico de calificarlos como “arrendamientos.” Igualmente aconsejable parece no llamar al contrato de obra “contrato de empresa”, que responde a un criterio, dice SANTOS BRIZ, exclusivamente económico o de grandes obras. La denominación más acertada es la de contrato de ejecución de obra.

Para su calificación han de tenerse en cuenta las siguientes circunstancias:

El ejecutor del trabajo o contratista lo realiza de manera independiente, en el sentido de no estar dirigido por el comitente en la ejecución de la obra, sino que ejecuta el trabajo en ejercicio de una profesión autónoma.

b) Lo más frecuente es que el contratista o artífice sea remunerado mediante un precio alzado, esto es determinando globalmente en consideración al resultado que ha de alcanzar. Pero cabe también que el precio se haya fijado por unidad de medida o número.

c) También será habitual que el contratista posea una habilidad y conocimientos técnicos adecuados a la realización de la obra que sean superiores o que no concurran con el comitente. Sin embargo, la circunstancia de no mediar esta diferencia no ha de conducir necesariamente a la conclusión opuesta. ...

d) El contratista trabaja generalmente con herramientas o equipo de su propiedad, y siempre que la clase de obra lo permita, en sus propios talleres o dependencias.

e) No es preciso que el contratista realice la obra personalmente y es suficiente que la dirija. Pero hay que señalar excepciones debido al diverso contenido que pueda tener este contrato; es decir, por la diversidad de obras que pueden ser objeto del mismo. Cuando se encarga un cuadro a un pintor defama, es indudable que no puede delegar en otro la ejecución del encargo, sin que ello le prive de su condición de contratista independiente. (Enfasis suplido.)

Para realizar la obra, el contratista puede tener, y en muchos casos es necesario que tenga, personal a su servicio; es decir, personas con las que mantiene un contrato de prestación de servicios. Pero si para llevar a término la obra contratada ha celebrado a la vez otro u otros contratos de obra con otros contratistas independientes, estaremos ante el supuesto de la subcontratación.

(4)2. Clases. - Cabe contratar la ejecución de obras muy diferentes, por lo que el contenido del contrato es muy amplio. ... [E]n los arts 1.588 a 1.600 [Arts. 1480 a 1492 del CC de P.R., 31 L.P.R.A. sees. 4121 a 4133,] aparece con carácter predominante el contrato que tiene por objeto la construcción de un edificio o la reparación de inmuebles. Algunos preceptos se refieren a la ejecución de obras en las que predomina el aspecto de la creación artística. En el mismo sentido hay que mencionar los contratos dirigidos a la consecución de un resultado por medio del encargo hecho a una persona con conocimientos especiales. (Enfasis suplido.)

Como tercera sección del capítulo dedicado al arrendamientos de obras y servicios, los arts 1.601 a 1.603 [Arts. 1493 a 1495 del CC de P.R., 31 L.P.R.A. sees. 4141 a 4143], regulan el contrato de transporte por agua y tierra, tanto de personas como de cosas. (Énfasis suplido.)

*693
Al igual que Puig Brutau, supra, otros tratadistas uniformemente consideran el contrato de transporte como una modalidad del contrato de obra. Manresa, Código Civil Español, t. X, vol. II, 6ta ed., Reus, Madrid, 1969, pág. 744, expresa que “El transporte es, según el Código, la tercera clase del arrendamiento de obras y servicios.” Gastan, Derecho Civil Español Común y Foral, t. 4, 12ma. ed, Reus, Madrid, 1985, pág. 525, expone: 

El Código Civil español regula el transporte como una modalidad especial del arrendamiento de obras y servicios, pero en realidad deberá ser incluido, por lo general, dentro de la especie locación de obra o contrato de empresa. Como una forma de esta última lo consideran muchos autores modernos, entre ellos Ruggiero, Collin y Capitant y, en España, Garrigues. Enneccerus considera que los contratos de transporte son contratos de obra, siempre que, como ocurre por lo regular se prometa no sólo la actividad del porteador, sino la llegada de las cosas o personas transportadas al lugar del destino. ... (Enfasis suplido.)

Por su parte, Diez-Picazo y Gullón, Sistema de Derecho Civil, vol. II, 7ma ed., Tecnos, Madrid, 1995, pág. 447, al discutir el contrato de transporte, comenta: “Su inclusión en el arrendamiento de obras y servicios no debe hacer olvidar que estamos ante un contrato de obra. El porteador no se obliga a desplegar solamente una actividad, sino a conseguir un resultado: el traslado de las personas o cosas de un lugar a otro. ” (Énfasis suplido.)
Enneccerus, Tratado de Derecho Civil, Derecho de Obligaciones, 1.11,-2°, v.l. °, 15 rev., Bosch, Barcelona, 1966, pág. 508, al discutir el contrato de obra en el título séptimo de dicho volumen, expone que: “II. Se entiende por obra en el sentido de este contrato todo resultado a producir por la actividad o por el trabajo. Por ejemplo, la producción o modificación de cosas, el transporte de personas o de cosas, la realización de una labor científica o la creación de una obra artística o inmaterial. ” (Énfasis suplido.)
El contrato de obra conlleva un precio cierto, que se fija al perfeccionarse el contrato, lo que se conoce como “por ajuste o precio alzado”. Ahora bien, el acuerdo contractual puede contemplar múltiples repeticiones de la obra, el número de las cuales no se fija desde el principio, en cual caso se acuerda un precio por cada repetición o unidad. A esos efectos, véase que Subcapítulo II del Capítulo 305 del Código Civil, lleva como título “Obras por Ajuste o Precio Alzado. ” Dentro de dicho subcapítulo, como parte integral del mismo, se incluye la modalidad de un precio fijo por pieza o medida, Art. 1484, 31 L.P.R.A. sec. 4125, el cual dispone como sigue:
“§ 4125. Obra por piezas o por medida

El que se obliga a hacer una obra por piezas o por medida, puede exigir del dueño que la reciba por partes y que la pague en proporción. Se presume aprobada y recibida la parte satisfecha”.

Puig Brutau, supra, págs. 469-470, aclara que el precio alzado o por ajuste incluye la modalidad de un precio unitario o por medida, incluyendo en su discusión del contrato de obra la siguiente elaboración:
“La necesidad de que el precio sea cierto (cfr. Art. 1.544[,Art. 1434 CC de P.R., 31 L.P.R.A. sec. 4013]), no significa que tenga que haberse concretado en el momento de la celebración del contrato y bastará que pueda determinarse posteriormente por un medio convenido.

El precio puede haberse fijado por ajuste o tanto alzado o por piezas ejecutadas o unidades de medida. Por ajuste o precio alzado significa que la obra se ha de realizar a cambio de un precio global La sección del Código que regula este contrato se titula precisamente “De las obras por ajuste o precio alzado. ”

A similar tenor, en Empresas Capote, Inc. v. Tribunal Superior, 103 D.P.R. 765, 772 (1975), opinión en la *694 cual el Tribunal Supremo discutió varios aspectos de las reclamaciones al amparo del Art. 1489, supra, éste observó que:
“El concepto contratista, va más allá del significado vinculante a la ingeniería, sino que se extiende a la acepción más amplia cubridora de la persona que se obliga frente a otra a realizar o producir determinados resultados o actividades a cambio de precio cierto; entendiéndose por precio cierto, precio determinable, ya sea mediante una remuneración única e invariable por toda la obra o por precio fijado por piezas o medidas. ” (Énfasis suplido.)
Al considerar el contrato entre Colgate y Access, supra, vemos que el precio cierto estaba expresado en los primeros cuatro apéndices del contrato, los cuales exponían las tarifas fijas que Colgate pagaría por el transporte. El contrato preveía múltiples repeticiones del traslado de objetos de un lugar a otro, por lo que el precio predeterminado se definía en los cuatro apéndices, los cuales establecían las tarifas para los posibles transportes. Reyes, a su vez, tenía un contrato con Access, el cual incluía tablas que fijaban las tarifas para los diferentes tipos de transporte que Reyes proveería. La relación de Reyes con Access es la de un subcontratista, siendo Access contratista general de Colgate.
Previamente, discutimos las consideraciones en equidad que constituyen la base del Art. 1489, entre éstas la doctrina de enriquecimiento injusto y el derecho del edificante de buena fe. Véase Goss, Inc. v. Dycrex Const. & Co, S.E., supra. Somos de la opinión que, por las mismas razones, los subcontratistas del comitente tiene acción legitimada para reclamar directamente al comitente. Los tratadistas españoles y el Tribunal Supremo de España así lo consideran. A manera de ejemplo, J. Puig Brutau, Fundamentos de Derecho Civil, t. II, vol. II, Bosch, Barcelona, 1982, pág. 475, expresa su criterio de que se debe considerar al subcontratista en forma similar a los obreros y materialistas, exponiendo que:

Titulares del crédito son "los que ponen su trabajo y materiales". Sin duda ha de entenderse que la dicción legal no excluye a los subcontratistas, como ya estimó la sentencia de 29 de junio 1936. (Énfasis suplido.)

Esta sentencia de 29 de junio 1936 (Aranzadi, núm. 1491) se refiere a un supuesto en que un subcontratista acciona contra el propietario para el cobro de sus créditos contra el contratista. La sentencia recurrida había desestimado la petición y el Tribunal Supremo desestima el recurso, pero por una razón ajena al problema que nos ocupa. Sin embargo, la misma sentencia desautoriza el criterio del Tribunal inferior por excluir indebidamente al subcontratista de la acción que autoriza el Art. 1.597[, Art. 1489 del C.C. de P.R.], exponiendo las razones que existen para estimarlo incluido. En síntesis, cabe decir que si dicho artículo no menciona expresamente a los subcontratistas es porque en el momento de la promulgación del Código no tenía esta figura contractual la importancia que ofrece en la actualidad. En todo caso, las razones de justicia que están en el fundamento del precepto tienen la misma fuerza y validez para que se consideren incluidos los subcontratistas. Por otra parte, la exclusión del subcontratista de la cadena que lleva hasta el propietario equivaldría a cerrar el paso a sus propios obreros para una eventual acción contra el propietario. ” (Énfasis suplido.)
Por las razones antes expuestas, consideramos que bajo el Art. 1489, supra, un subcontratista de transporte de mercancías, al igual que el materialista u obrero en un contrato de construcción, tiene una acción directa contra el dueño de lo que se transporta, hasta la cantidad que el principal adeude al contratista general, cuando el subcontratista presenta su reclamación contra el contratista del principal.
En la demanda de autos, Reyes, como subcontratista de Colgate, reclama contra Colgate el pago de lo que esta última alegadamente debe al contratista general, Access. Indica que sus esfuerzos para cobrar a Access, lo que ésta le adeuda, no han tenido éxito, por lo que demanda a Colgate en acción directa al amparo del Art. *695 1489, supra. Dado que el contrato de Access con Colgate es un contrato de obra o servicios, Reyes, como subcontratista, está legitimado para reclamar extrajudicialmente y/o demandar en acción directa a Colgate hasta la cantidad de dinero que Access le adeuda a virtud del subcontrato. Bajo la doctrina de Goss, Inc. v. Dycrex Const. & Co, S.E., 141 D.P.R. 342, 359 (1996), el comitente o dueño de la obra se convierte en deudor de los obreros, materialistas y subcontratistas, desde el instante mismo en que estos últimos reclamen su acreencia al comitente de la obra, ya sea judicial o extrajudicialmente. Dicho reclamo directo, también, está limitado por la cantidad que Colgate le adeuda a Access, al presentarse el reclamo. Ha de tenerse en cuenta que al calcular la deuda del comitente al contratista general, no se pueden considerar reclamos “que pudiese presentar el dueño de la obra contra el contratista, por razón de otros trabajos no relacionados con el contrato para la realización de la obra que dio margen a la acreencia. ” Goss, Inc. v. Dycrex Const. & Co, S.E., supra, pág. 352. La causa de acción directa contra Colgate presentada por Reyes, como antes señalado, cumple con lo requerido por el Art. 1489, supra, por lo que no procedía la desestimación sumaria.
Resumiendo las discusiones antes presentadas, no procedía la desestimación solicitada por Colgate, en la presente etapa procesal, ya que interpretadas las alegaciones de las partes en la forma más favorable a Reyes, ninguno de los dos fundamentos aducidos para sostener la solicitud de desestimación es válido. Bajo el esquema del Código Civil, el contrato de transporte es uno de los contratos de ejecución de obra. Por lo tanto, bajo el Art. 1489, supra, Reyes, como subcontratista de Colgate, podría estar legitimado para presentar un reclamo directo contra Colgate, por la suma que Access le debe a él y hasta el monto de lo que Colgate pueda adeudar a Access. Concluimos que no procedía la desestimación sumaria solicitada por Colgate, por lo que no incidió el Tribunal de Primera Instancia al denegar dicha solicitud.
y
Por las consideraciones antes expuestas, se expide el auto de certiorari, se confirma la resolución que denegó la desestimación de la causa de acción directa contra Colgate presentada por la parte demandante y se devuelve el caso al Tribunal de Primera Instancia para que continúen los procedimientos en forma compatible con lo expuesto en la presente sentencia.
Lo acordó y manda el Tribunal y lo certifica la Secretaria Interina del Tribunal.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones
ESCOLIOS 2007 DTA 9
1. Microsoft Encarta College Dictionary, 2001, pág. 847, provee la siguiente definición de “Logistics“Movement management, the planning and control of the flow of goods and materials through an organization or manufacturing process”.
2. Véase el párrafo 9 del referido contrato, denominado “Articles and Commodities Encompassed”, pág. 119 del apéndice.
3. Ambos contratos entre Reyes y Access se refieren a Luis Transport Services Corp. No obstante, en la demanda se identifica a la parte demandante como Luis Félix Reyes Mojica d/b/a Luis Transport Service.
4. Debe tenerse presente que el contrato que hay que tipificar como civil o mercantil es el contrato entre Colgate y Access. Si dicho contrato es un contrato de obra de naturaleza civil, entonces los subcontratistas, materialistas y obreros de Access tienen derecho a una acción directa contra Colgate si Access no le paga su acreencia. Bajo la doctrina de Goss, Inc. v. Dycrex Const. & Co, S.E., 141 D.P.R. 342, 359 (1996), el comitente o dueño de la obra se convierte en deudor de los obreros, materialistas y subcontratistas, desde el instante mismo en que estos últimos reclamen su acreencia al comitente de la obra, ya sea judicial o extrajudicialmente.
5. La demanda incluye también un reclamo en daños y perjuicios bajo el Art. 1802 del Código Civil, de Reyes contra *696 Colgate. La discusión en la presente sentencia se limita a la solicitud de Colgate para que se desestime la causa de acción presentada por Reyes al amparo del Art. 1489, supra, del Código Civil. El reclamo de daños extracontractuales, es otra causa de acción independiente, la continuación de la cual no está en controversia en el presente recurso.
6. En situaciones en que no aplica el derecho de acción directa que concede el Art. 1489, supra, el subcontratista sólo tiene disponible el derecho de subrogación que provee el Art. 1064 del Código Civil, 31 L.P.R.A. sec. 3028., el cual provee:

Los acreedores, después de haber perseguido los bienes de que esté en posesión el deudor para realizar cuanto se les debe, pueden ejercitar todos los derechos y acciones de éste con el mismo jin, exceptuando los que sean inherentes a su persona; pueden también impugnar los actos que el deudor haya realizado en fraude de su derecho. ”

7. A similar tenor, Comentarios al Código Civil y Compilaciones Forales, dirigido por Manuel Albaladejo, t. XX, vol. 2, Edersa, Madrid, 1986, pág. 487, comenta que “son muchos los autores que consideran al transporte como una modalidad de arrendamiento de obra, caracterizado por el específico resultado que aquí se persigue (conducción o traslado de cosas o personas de un lugar a otros)... ”.